475 S.E.2d 548

**STATE of West Virginia ex rel. VIRGINIA M., Petitioner Below, Appellee,**

v.

**VIRGIL EUGENE S. II, an Infant; Gina Lynn S. and Ralph M., His Parents, Respondents Below, Appellants.**

No. 22949.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 17, 1996.

Decided July 19, 1996.

William C. Martin, Prosecuting Attorney of Braxton County, Sutton, for State.

Matthew A. Victor, Charleston, for Virgil S.

Maureen Conley, Legal Aid Society of Charleston, Charleston, for Gina S.

PER CURIAM.

The Appellant, Gina Lynn S., appeals from an order of the Circuit Court of Braxton County dated September 20, 1994, terminating her custodial rights to her son, Virgil Eugene S., and granting permanent custody to the child's paternal grandmother, Virginia M.[1] The order also terminated the custodial rights of the father, Ralph M., who does not join in this appeal. Gina Lynn S. asserts that her custodial rights should not have been terminated, and that the circuit court should have granted her an improvement period prior to termination. Based on our review of the record, we agree that the circuit court erred when it denied her request for an improvement period, and we remand the case for further proceedings consistent with this opinion.

## I.

Virgil Eugene S. ("Gene") is seven years old. He was a premature baby, and suffers from a host of physical problems, including mild cerebral palsy, hyperactivity, eye problems, and asthma. From the time he left the

---

1. We follow our past practice in domestic and juvenile cases that involve sensitive facts, and do not use the last names of the parties. See, e.g., State ex rel. West Virginia Dep't of Human Servs. v. Cheryl M., 177 W.Va. 688, 689, 356 S.E.2d 181, 182 n. 1 (1987).

hospital as an infant, Gene has spent more time in the Braxton County home of his paternal grandmother, Virginia M., than in Charleston with his mother, Gina Lynn S. This arrangement was mutually satisfactory for several years, including a period in which the mother and grandmother informally agreed to alternate care for Gene every two weeks.

Gina Lynn S. has two other children and limited resources, so Virginia M.'s participation in Gene's upbringing helped her to provide for his special physical and medical needs. There is also evidence that early in the child's life Gina Lynn S. often entrusted him to her mother-in-law to avoid exposing him to domestic violence perpetrated by Ralph M. (Virginia M.'s adopted son), who is no longer in the home. Later, Gina Lynn S. testified that she felt some pressure to leave Gene with Virginia M. for longer visits when the grandmother represented that both she and her husband had cancer. Gina Lynn S. testified that Virginia M. seemed to want Gene near her, and that she complied because she feared the grandmother would not be alive much longer. Nevertheless, Gina Lynn S. did participate significantly as Gene's parent, having him in her home often and consenting to his extended stays with Virginia M., prior to the initiation of these proceedings.

Early in 1993, after over four years of sharing Gene's care, Virginia M. became dissatisfied. She contacted the Department of Health and Human Resources ("DHHR") for help, complaining that Gina Lynn S. allowed Gene to reside with her for extended periods of time, but did not provide financial help or Gene's Medicaid card. Virginia M. also wanted to enroll Gene in preschool, but did not have legal authority to sign papers as his parent or guardian. DHHR determined that the case did not warrant intervention, because Gina Lynn S. had properly provided for the child by placing him with his grandparents.[2] DHHR then referred Virginia M. to the county prosecutor for a possible solution to her problems.

On January 11, 1993, the Prosecuting Attorney for Braxton County filed a petition on behalf of Virginia M. alleging abuse and neglect, and requesting a grant of temporary custody under West Virginia Code § 49–6–3 (1995). The Circuit Court of Braxton County granted emergency temporary custody to Virginia M. the same day.

The circuit court held a preliminary hearing on January 27, 1993, after which it granted continued custody to Virginia M., and visitation rights to Gina Lynn S. On March 17, 1993, the lower court held a hearing on a motion by the State to terminate visitation. Following that hearing, the court made a finding of neglect,[3] but did not terminate visitation. Almost a year later, on February 7, 1994, the court held a third hearing,[4] after which it granted continued custody to Virginia M., and denied Gina Lynn S.'s motion for an improvement period pursuant to West Virginia Code § 49–6–2(b) (1995). The court conducted a dispositional hearing on March 11, 1994, again denied the mother's motion for an improvement period, and issued its final order on September 20, 1994.

The majority of the evidence at these hearings was testimony by Virginia M. and Gina Lynn S. The grandmother asserted that she had most of the responsibility for her grand-

---

**2.** It appears that this case might have more appropriately been brought as a custody matter, rather than as an abuse and neglect proceeding. *See, e.g., In re Cottrill*, 176 W.Va. 529, 346 S.E.2d 47 (1986). The petition alleged only that the child lived with his grandmother most of the time, that he had special medical and educational needs, and that (quoting the statutory definition of "neglected child" in W.Va.Code § 49–1–3(g)(1)) "when he is in the possession of his mother ... his physical and mental health is harmed and threatened by a present refusal, failure and inability of the said [mother] to supply said child with necessary food, clothing, shelter, supervision, medical care and education."

**3.** The court's finding of neglect was based on the testimony of Dr. Givens, discussed below. The court's order finding neglect included no findings of fact. The court found on the record, however, that Gene had sustained bruises while on a weekend visit with Gina Lynn S., that the bruises were intentionally inflicted, and that it was unlikely that the bruises had been inflicted by a child, which was Gene's explanation.

**4.** It is totally unclear from the record why the court and the lawyers let this matter languish without any resolution for this length of time.

son's care, and that she and her husband provided him with a good home. She commented on her daughter-in-law's poor housekeeping, drinking, and slovenly habits, but tempered these criticisms with remarks such as, "I think the world and all of Gina, but I don't approve of the way she takes care of the baby," and conceded that Gina could be a decent mother if given an opportunity.

For her part, Gina Lynn S. testified that she stayed with Gene day in and day out for four months in the hospital after his premature birth, and looked after his special needs by taking him to various physicians in Charleston, and to the Shriners' hospital in Kentucky. Most of the housekeeping problems, according to Gina Lynn S., were attributable to Ralph M., who was chronically unemployed, abused alcohol, and abused Gina Lynn S. Although the two were never married, they lived together "off and on" for about four years. Ralph M. has not, however, been in the household since February, 1992, approximately one year before this action was filed. Since Gene was removed from her custody, Gina Lynn S. has attended every hearing, visited Gene in Braxton County when she was able, talked with him on the phone, and brought him Christmas presents.

The most damaging evidence concerned an incident that occurred after the court's grant of custody to Virginia M. at the January 27, 1993, hearing. Dr. William Douglas Given[5] testified at the March 17, 1993, hearing on the State's motion to terminate visitation. Dr. Given had examined Gene a few days after Gene returned from a weekend visit with Gina Lynn S. on March 6th and 7th. Dr. Given found several areas of bruising consistent with being struck with an object, and also noted a "marked failure to thrive." When questioned by Dr. Given, Gene report-ed that his three-year-old cousin had beaten him with a "razor stroke." Dr. Given concluded that, in his opinion, the child was abused. Dr. Given based his opinion, in part, on Gene's "failure to thrive," because his weight and height were less than the 50th percentile for his age. Because Gene resided with his grandparents more than with his mother, and failure to thrive in the context of child abuse is generally considered to be the result of long-term conditions of physical and/or emotional neglect,[6] we are inclined to discount this factor as evidence of any mistreatment by Gina Lynn S. It is cause for concern, and may have indicated that there was neglect in this case. However, the record is unclear as to whether Gene's size was in any way related to his cerebral palsy or other medical problems.

In this appeal, Gina Lynn S. asserts that the circuit court erred by (1) failing to dismiss the case at the preliminary hearing for failure to present a prima facie case of abuse or neglect; (2) finding that the evidence of abuse and neglect met the "clear and convincing" standard; and (3) refusing to grant her an improvement period.[7] The guardian ad litem, on behalf of the child, requests that this Court affirm the lower court's grant of custody to Virginia M., but remand the case to the circuit court for consideration of an improvement period for Gina Lynn S., or another custodial arrangement, in order to provide for the best interests of the child in the event that Gene outlives his grandmother.[8]

## II.

Our standard of review in an abuse and neglect proceeding has been summarized as follows:

---

5. Dr. Given is a general practitioner in Gassaway, West Virginia. He examined Gene only once, and had no continuing responsibility for his care. The record reflects that Virginia M. took Gene to the Public Health Department on March 9, 1993, because he returned with several bruises after a weekend visit with his mother. The Public Health Department nurse referred Gene to Dr. Given for an evaluation of child abuse.

6. *See generally The Merck Manual* 1964–67 (15th ed. 1987).

7. The Appellant also asserts that she received ineffective assistance of counsel in the lower court proceedings. Because we reverse and remand the case on other grounds, we do not reach this issue.

8. At the time oral argument, Virginia M. was 71 years old. Gina Lynn S. was 25. Gina Lynn testified that Virginia M. had said that both she and her husband had cancer. Virginia M. testified, however, that she was in good health.

Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

Syl. Pt. 1, *In the Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

We address first the Appellant's assertion that the Appellees failed to present a prima facie case of abuse or neglect at the preliminary hearing. The trial court's initial ruling granting custody of Gene to his grandmother was based on West Virginia Code § 49–6–3 (1995), the provision for temporary custody of an abused or neglected child. West Virginia Code § 49–6–3(a) gives a court the authority to order a grant of temporary custody only "if it finds that: (1) There exists imminent danger to the physical well-being of the child, and (2) there are no reasonably available alternatives to removal of the child. . . ." In this case, no imminent danger was even alleged. The grandmother's sole complaint was that Gina Lynn S. was not providing any financial or medical contribution to Gene's care. Further, the child was already in the grandmother's custody, with his mother's permission, when the petition was filed. This made "removal of the child" unnecessary and, from the grandmother's perspective, undesirable. Thus we conclude that the trial court's initial grant of emergency custody under West Virginia Code § 49–6–3 and the denial of an improvement period were clearly wrong.

West Virginia Code § 49–6–1(a) (1995) provides the appropriate procedure for resolving non-emergency abuse or neglect situations:

If the state department or a reputable person believes that a child is neglected or abused, the department or the person may present a petition setting forth the facts to the circuit court in the county in which the child resides. . . . The petition shall be verified by the oath of some credible person having knowledge of the facts. The petition shall allege specific conduct including time and place, how such conduct comes within the statutory definition of neglect or abuse with references thereto, any supportive services provided by the state department to remedy the alleged circumstances and the relief sought.

When, as in this case, the child is not in imminent danger, the court can thus consider whether the child is abused or neglected *prior* to a transfer of custody. Although this case might more properly have been brought as a domestic/custody matter, it is here as an abuse and neglect proceeding and thus we will treat it as such.

### III.

Gina Lynn S. twice asked the circuit court to grant her an improvement period, and both times the court refused. This Court addressed a similar situation in *State ex rel. West Virginia Department of Human Services v. Cheryl M.*, 177 W.Va. 688, 356 S.E.2d 181 (1987). There we said, "W.Va. Code, 49–6–2(b) (1984), permits a parent to move the court for an improvement period *which shall be allowed unless the court finds compelling circumstances to justify a denial.*" *Id.*, Syl. Pt. 2 (emphasis added). The Court in *Cheryl M.* quoted with approval the following explanation:

Clearly, the statute presumes the entitlement of a parent to an opportunity to ameliorate the conditions or circumstances upon which a child neglect or abuse proceeding is based pending final adjudication, no doubt in recognition of the fundamental right of a parent to the custody of minor children until the unfitness of the parent is proven. *See, e.g., In re Willis*, 157 W.Va.

225, 207 S.E.2d 129 (1973). The statute permits the court to deny such a request only upon a finding of 'compelling circumstances.'[9]

177 W.Va. at 691–92, 356 S.E.2d at 184–85 (quoting *State v. Scritchfield*, 167 W.Va. 683, 692–93, 280 S.E.2d 315, 321 (1981)).

■ The record includes one instance of alleged abuse, which produced bruises, as well as evidence that Gina Lynn S. left Gene in his grandmother's care for extensive periods of time. Though not to be taken lightly, this one incident does not constitute the "compelling circumstances" sufficient to deny the natural mother in this case any chance for rehabilitation. In fact, the court appeared to rely more on Gina Lynn S.'s abandonment of the child to his grandmother's care as evidence of her neglect. This was an agreed-upon arrangement, however, and thus did not constitute abandonment. The grandmother conceded at the preliminary hearing, the very first time the court heard evidence, that Gina Lynn S. could be a good mother if given an opportunity. The lower court should have recognized this as a situation in which a well-designed and well-implemented improvement period could provide that opportunity. We therefore conclude that the lower court erred in permanently terminating custodial rights without granting Gina Lynn S. an improvement period pursuant to West Virginia Code § 49–6–2(b).

As part of the improvement period, the court on remand should order DHHR to prepare a family case plan pursuant to West Virginia Code § 49–6D–3 (1995), as required by Code § 49–6–2(b). The family case plan should provide detailed standards by which improvement can be measured, as well as a blueprint for DHHR to monitor, and specific information for the court to consider at disposition. *See In re Carlita B.*, 185 W.Va.

613, 624, 408 S.E.2d 365, 376 (1991); *Cheryl M.*, 177 W.Va. at 693, 356 S.E.2d at 186. This appears to be a case in which a child has two willing caretakers who love and care for him, and he needs them both. The improvement period should be designed to maximize the benefits of both relationships, to help Virginia M. and Gina Lynn S. cooperate in Gene's care, and to help them work together to promote the best interests of the child.

## IV.

This Court has said repeatedly that "matters involving the abuse and neglect of children shall take precedence over almost every other matter with which a court deals on a daily basis...." *In re Carlita B.*, 185 W.Va. 613, 625, 408 S.E.2d 365, 377 (1991). We reiterated that urgency recently in *In the Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177, 184–85 (1996). This case has dragged on for over three years without ever affording the mother a formal improvement period, and without establishing any real permanency plan for Gene as required by West Virginia Code § 49–6–5(a) (1995). Meanwhile, Gene has become firmly entrenched in his grandparents' household.[10] Undoubtedly there are strong emotional bonds between Gene and his grandparents. As in *Cheryl M.*, however:

> [C]onstitutional considerations as reinforced by the [West Virginia Child Protective Services Act] mandate preservation of parental rights. It is only when bona fide attempts at counseling fail or the original abuse and neglect is so egregious that an improvement period will be of no avail that a court may be warranted in severing parental rights.

177 W.Va. at 695, 356 S.E.2d at 188. This Court's decision in *Lemley v. Barr*, 176 W.Va. 378, 343 S.E.2d 101 (1986) may prove

9. We note that West Virginia Code § 49–6–12 (1996), recently enacted by the West Virginia Legislature, now requires a parent seeking an improvement period in cases of neglect or abuse to file a written motion requesting it, and to demonstrate by clear and convincing evidence that he or she is likely to fully participate in the improvement period. Thus rather than presuming the entitlement of a parent to an improvement period, as under *Cheryl M.*, quoted in the text above, the law now places on the parent the

burden of proof regarding whether an improvement period is appropriate. We review this case, however, under the law as in effect at the time of the circuit court's decision.

10. Virginia M.'s husband lives with her and is approximately 65 years old. For reasons that were not explained to the Court, he is not a party to these proceedings.

instructional to the circuit court when considering this case on remand. In *Lemley*, we acknowledged that returning custody to a natural parent may not always be in the best interests of the child, even in the case of two relatively innocent parties. The dispute in that case was between the natural mother and the child's adoptive parents. Although we concluded that the adoption was invalid, we nevertheless held that there must be a determination of what physical custody arrangement was in the child's best interests, because the five-year-old child had spent almost his entire life with adoptive parents. *Id.* at 385–86, 343 S.E.2d at 109.

This does not appear to be a case in which a parent abandoned her child with no intent to return.[11] What started out as a consensual arrangement deteriorated into a custody battle on account of support issues. There must be an equitable resolution that both serves the best interests of the child and protects the rights of the natural mother and the grandmother. An important consideration the court must weigh in determining an arrangement that will serve the best interests of the child in this case is the age and health of the grandmother, and her ability to continue to care for Gene. Gene has special needs, and may need care beyond the age of majority. Reuniting him with his mother, or at least ensuring that their relationship is strengthened and sustained, would help to provide for this long-term contingency.

It would have been far better if the parties in this case had approached the challenge of Gene's custody from a humanistic perspective, rather than having their lawyers drawing the lines of battle in the sand. It is obvious that this child needs both of these people in his life. His special medical and educational needs make it difficult for his mother to care for him, and his grandmother's advanced age makes it unlikely that she can provide the permanent care that Gene may well need. The social services and the legal system in such a case should work to facilitate a relationship with both "mothers," instead of choosing an all-or-nothing custodi-

an. The circuit court on remand should be mindful also that no matter who becomes Gene's primary custodian, he has the right to a continued relationship with both his grandmother and his mother. *See Honaker v. Burnside*, 182 W.Va. 448, 388 S.E.2d 322 (1989), and to continued association with his siblings, *see* Syl. Pt. 5, *In re Christina L.*, 194 W.Va. 446, 460 S.E.2d 692 (1995), in appropriate circumstances.

■ Furthermore, should it be determined that Gene should be restored to the full custody of his mother, any such significant alteration in his physical custody should be made in the form of a gradual transition to reduce any possible trauma associated with a dramatic change in custody. *See, e.g.,* Syl. Pt. 3, *James v. Maynard*, 185 W.Va. 648, 408 S.E.2d 400 (1991); *Honaker v. Burnside*, 182 W.Va. 448, 388 S.E.2d 322 (1989). We said in *Honaker*:

> For the transition period to be effective in accomplishing this purpose, it should provide for ever-increasing amounts of visitation for the natural [parent] so as to lead to a natural progression to full custody. Such transition plan should give due consideration to both parties' work and home schedules and to the parameters of the child's daily school and home life, and should be developed in a manner intended to foster the emotional adjustment of these children to this change while not unduly disrupting the lives of the parties or the children.

182 W.Va. at 453, 388 S.E.2d at 326.

For the foregoing reasons, the judgment of the Circuit Court of Braxton County is affirmed with respect to the grant of custody and reversed with respect to the grant of an improvement period. We, therefore, remand this case for further proceedings consistent with this opinion. We direct the court on remand to order an improvement period for Gina Lynn S., to examine the needs of the child in this case, with the help of the Department of Health and Human Resources, if necessary, and to consider a plan that would

---

11. This case must be distinguished from cases such as *Department of Human Servs. v. La Rea Ann C.L.*, 175 W.Va. 330, 332 S.E.2d 632 (1985), in which a minor voluntarily gave her child up for adoption.

result in a gradual transition of custody back to Gina Lynn S.

Reversed and Remanded.